792 A.2d 1102

**Millicent KASSAMA, Individually, et al.,**

v.

**Aaron H. MAGAT, et al.**

**No. 38, Sept. Term, 2001.**

Court of Appeals of Maryland.

Feb. 5, 2002.

Reconsideration Denied April 5, 2002.

Matt R. Ballenger (James M. Roquemore of The Suder Law Firm, P.A., on brief), Baltimore, for petitioners/cross-respondents.

E. Dale Adkins, III and Gregory L. Van Geison (Lynne B. Malone of Anderson, Coe & King, LLP, on brief), Baltimore, for respondents/cross-petitioners.

Argued before BELL, C.J., and ELDRIDGE, RAKER, WILNER, CATHELL, HARRELL and BATTAGLIA, JJ.

WILNER, Judge.

This is a medical malpractice action brought by petitioner, Millicent Kassama, for herself and for her young daughter, Ibrion, against Aaron Magat, the obstetrician who treated her during her pregnancy.[1] The action arises from the unfortu-

---

1. Dr. Magat and his professional association were named as defendants. No independent negligence was alleged or proved against the

nate fact that Ibrion was born with Down's Syndrome.[2]   Dr. Magat is not charged with having caused that disorder but rather with causing Ibrion to be born, with negligently having precluded petitioner from exercising her option to abort the pregnancy.

The gravamen of the complaint, as it has evolved during the course of the litigation, is that Dr. Magat failed to advise petitioner of the result of an alpha-fetoprotein (AFP) blood test that indicated a heightened possibility that Ibrion might be afflicted with Down's Syndrome.[3]   Had she received that information, petitioner now contends, she would have undergone an amniocentesis, which would have confirmed that prospect, and, had that occurred, she would have chosen to terminate the pregnancy through an abortion.

Four causes of action were pled.   In Count I, petitioner, on behalf of Ibrion, complained that, but for Dr. Magat's negligence, petitioner would have terminated the pregnancy and Ibrion would not have been born with her current afflictions. This kind of action has often, though perhaps misleadingly,

professional association, however, so we shall refer to the defendants henceforth in the singular, as Dr. Magat.

2.   Down's Syndrome is named for John Langdon Down, an English physician who, in 1866, published an accurate description of a person with this abnormality.   Regrettably, in remarking on the facial similarities of a group of his mentally retarded patients, he used the term "mongol," a racial pejorative that led to a century of misleading terminology.   The syndrome has an overall incidence rate of approximately 1 in 800 births and occurs equally among all races.   "In 1959, a French physician, Jerome Lejeune, identified Down syndrome as a chromosomal anomaly.   Instead of the usual 46 chromosomes present in each cell, Lejeune observed 47 in the cells of individuals with Down syndrome."   *See* NATIONAL DOWN SYNDROME SOCIETY, DOWN SYNDROME, *When Was Down Syndrome Discovered?*, p. 2. The extra genetic material is in the form of additional genes on the 21st chromosome.

3.   In the complaint, petitioner alleged that Dr. Magat had failed even to order the AFP test.   When the evidence showed that he had, in fact, ordered such a test for her and that she actually had the test, the allegation shifted to the charge that Dr. Magat negligently delayed in ordering the test and in communicating with the lab that conducted it, and that he had failed to advise her of the result.

been referred to as one for "wrongful life."[1] It is based on the premise that being born, and having to live, with the affliction is a disadvantage and thus a cognizable injury, when compared with the alternative of not having been born at all—that an impaired existence is worse than nonexistence—and that, if that injury results from the defendant's negligence, a cause of action exists. Through her mother, Ibrion sought recompense for the care and attention she would require, for the expense she would incur for the rest of her life, for the loss of future income, for physical and emotional pain and suffering, and for past and future bodily injury. In Count II, petitioner sought damages for her own pain, suffering, and distress and for the expenses she has incurred and will incur by reason of Ibrion's disability.

Counts III and IV were captioned "Informed Consent." In them, petitioner, for herself in one instance and for Ibrion in the other, alleged that Dr. Magat had an obligation to administer an AFP screening, an amniocentesis, or other fetal diagnostic procedure and to inform petitioner of the increased risk that she would give birth to a baby afflicted with Down's Syndrome, that had he informed her of that risk, she "would have sought an AFP screening, an amniocentesis, and/or other tests," and, based on the results of those tests, would have terminated the pregnancy. As the result of "the lack of informed consent," she relied on "all of the Defendants' representations," and gave birth to a child afflicted with Down's Syndrome.

Three of the four counts were dismissed either prior to or during trial. Count IV—Ibrion's action for lack of informed consent—was disposed of through the pretrial granting of a

---

4. In *Reed v. Campagnolo*, 332 Md. 226, 237, 630 A.2d 1145, 1150 (1993), we agreed with the view of the Massachusetts court in *Viccaro v. Milunsky*, 406 Mass. 777, 551 N.E.2d 8, 9 n. 3 (1990), that the term "wrongful life" was really not instructive, as any wrongfulness is in the negligence of the physician, not the life of the child, that " '[t]he harm, if any, is not the birth itself but the effect of the defendant's negligence on the [parents] resulting from the denial to the parents of their right, as the case may be, to decide whether to bear a child or whether to bear a child with a genetic or other defect.' "

motion for partial summary judgment. Petitioner voluntarily withdrew Count III, her own action for lack of informed consent, and Count I—Ibrion's claim for "wrongful life"—was dismissed on motion for judgment made at the end of the plaintiff's case. Only Count II—petitioner's action for negligence—was submitted to the jury, which found for Dr. Magat. In a special verdict, it found that Dr. Magat was negligent but that petitioner was contributorily negligent. Petitioner appealed, complaining about the dismissal of Count I, the submission of the issue of her contributory negligence on Count II to the jury, and the court's refusal to give a "last clear chance" instruction with respect to Count II. No complaint was made about the fate of the informed consent claims. The Court of Special Appeals affirmed, *Kassama v. Magat*, 136 Md.App. 637, 767 A.2d 348 (2001), and so shall we.

## BACKGROUND

This was petitioner's fifth pregnancy. Three of her other children were born healthy and without affliction, and she aborted one pregnancy during the first trimester. Petitioner suspected that she might be pregnant with Ibrion in January, 1995. More certain in February, she consulted her primary care physician late in that month and was referred to Dr. Magat's professional association. According to Dr. Magat's records, she did not call for an appointment until March 29, however—a delay of about a month—and it was not until April 19 that he was able to see her. When petitioner appeared at his office that day, Dr. Magat estimated from an ultrasound examination that the fetus was 17 weeks, 5 days old. He noted in petitioner's record that she was a "late registrant," meaning that she came to him late in her pregnancy.

That fact serves as a critical backdrop for the basic dispute in this case. Although for purposes of estimating a delivery date, the human gestational period is commonly referred to as being approximately 280 days (40 weeks) from the first day of the mother's last normal menstrual period, the actual gestational term, based on ovulatory or fertilization age, is two

weeks shorter—38 weeks or 266 days.[5] When *Roe v. Wade*, 410 U.S. 113, 160, 93 S.Ct. 705, 730, 35 L.Ed.2d 147, 181 (1973) was decided, it was thought that a fetus became viable—able to live outside the mother's womb—at about 28 weeks, possibly as early as 24 weeks. In *Planned Parenthood v. Casey*, 505 U.S. 833, 860, 112 S.Ct. 2791, 2811, 120 L.Ed.2d 674, 703 (1992), Justice O'Connor noted that viability may occur as early as 23 weeks.[6]

This has a practical significance in terms of certain treatment options. Maryland law precludes *the State* from interfering with the decision of a woman to terminate a pregnancy

---

**5.** *See* F. GARY CUNNINGHAM, MD, ET AL., WILLIAMS OBSTETRICS, at 226 (21st ed. 2001) ("The mean duration of pregnancy calculated from the first day of the last normal menstrual period is very close to 280 days, or 40 weeks.... *It is customary to estimate the expected date of delivery by adding 7 days to the date of the first day of the last normal menstrual period and counting back 3 months* (Naegele rule)." (emphasis in original)). *See also* VIVIAN M. DICKERSON & RONALD A. CHEZ, *Normal Pregnancy and Prenatal Care*, DANFORTH'S OBSTETRICS AND GYNECOLOGY, at 68 (8th ed. 1999) ("Naegele's rule is commonly applied in calculating an estimated date of confinement (EDC). Using the date of the patient's last menstrual period minus three months, plus 1 week and 1 year, it is based on the assumptions that a normal gestation is 280 days and that patients all have 28-day menstrual cycles. After adjustment for a patient's actual cycle length, natality statistics indicate that the majority of pregnancies deliver within 2 weeks before or after this estimated date."). WILLIAMS points out that, although "clinicians conventionally calculate *gestational age* or *menstrual age* from the first day of the last menstrual period, to identify temporal events in pregnancy ... [e]mbryologists and other reproductive biologists more often employ *ovulatory age* or *fertilization age*, both of which are typically 2 weeks shorter." WILLIAMS, *supra*, at 226. It is of note that, in *Roe v. Wade*, 410 U.S. 113, 125, 93 S.Ct. 705, 713, 35 L.Ed.2d 147, 161 (1973), Justice Blackmun used the ovulatory age of 266 days, or 38 weeks, in determining the normal term of human pregnancy. Facts of this kind are subject to judicial notice. *See Faya v. Almaraz*, 329 Md. 435, 446, 620 A.2d 327, 332 (1993).

**6.** In his opinion for the Court of Special Appeals in this case, Judge Salmon, quoting from American Academy of Pediatrics Committee on Fetus and Newborn, *Perinatal Care at the Threshold of Viability*, 96 Pediatrics 974 (1995) noted that "[t]he survival of infants born from 23 to 25 weeks of gestation increases with each additional week of gestation," but that "the overall neonatal survival rate for infants born during this early gestational period remains less than 40%." *Kassama v. Magat, supra*, 136 Md.App. at 646 n. 9, 767 A.2d at 353 n. 9.

(1) before the fetus is viable, or (2) at any time during the pregnancy if either "the termination procedure is necessary to protect the life or health of the woman" or "the fetus is affected by genetic defect or serious deformity or abnormality." Md.Code, § 20–209(b) of the Health General Article. Notwithstanding that *the State* may not preclude an abortion, at any time, when the fetus has such a condition, the evidence in this case was undisputed that no doctor in Maryland will perform an abortion with respect to a Down's Syndrome child after the fetus becomes 23 weeks, 6 days old. To have such an abortion performed by a physician at or after 24 weeks, the woman must go out of State—to New York, Kansas, or Arkansas, according to the testimony.

It appears to be a standard part of obstetrical care for a patient such as petitioner, who was 30 at the time, to have blood drawn for an AFP test, which measures the level of alpha-fetoprotein in the blood and serves as a screening device for certain fetal disorders.[7] An abnormally high level of AFP suggests the possibility that the fetus may have, among other things, spina bifida or other neural tube defects; a very low level suggests the possibility of Down's Syndrome. Evidence in this case indicates that the test is normally performed when the patient is between 15 and 16 weeks pregnant but that it may be performed as late as 19 weeks. The AFP test is not determinative for Down's Syndrome. Testimony indicated that it will return a positive result in about 60% of the cases but accurately diagnoses Down's Syndrome only 2% of the time. The experts all agreed that, if the test shows the prospect for Down's Syndrome, the doctor should explain the significance of that result and offer the patient an amniocen-

---

7. According to the American Medical Association's ENCYCLOPEDIA OF MEDICINE, alpha-fetoprotein is produced in the liver and gastrointestinal tract of the fetus and is excreted through fetal urine into the amniotic fluid. The fluid is swallowed by the fetus, introducing the AFP into the fetal digestive system. Some of the protein passes from the fetus's circulation and "can be measured in the maternal blood from the second quarter of pregnancy onward, peaking between weeks 15 and 20 and then slowly decreasing." AMERICAN MED. ASSOC. ENCYCLOPEDIA OF MEDICINE, at 88 (Charles B. Chapman, MD ed.1989).

tesis, which will more accurately determine the existence of that disorder.

Amniocentesis is a more invasive procedure and carries certain attendant hazards, one of which, according to Dr. Magat, is a slightly increased risk of a miscarriage. It is not, therefore, performed without a reason. Fluid is withdrawn by needle from the amniotic sac in the uterus. Although the fluid consists mostly of fetal waste, it also has in it discarded skin cells that contain fetal DNA. Once extracted, the skin cells are cultured for about two weeks, at which point the DNA can be examined to determine, among other things, the presence of Down's Syndrome. Expert testimony presented by both parties indicated that the normal waiting period for results of an amniocentesis is approximately two weeks, although one of petitioner's experts, Dr. Lawrence Borow, opined that it was possible, with a "rush" amniocentesis, to obtain results in as little as seven days.[8]

The relevance of this is in the sequencing, or time line, working backward from the 24–week practical deadline in Maryland for aborting a pregnancy because of a Down's Syndrome fetus. To protect a patient's option to terminate her pregnancy, the AFP screening which, as noted, is usually done between the fifteenth and nineteenth weeks of pregnancy, must be done in time to obtain and examine the results and determine, if the test is positive for Down's Syndrome, whether to proceed with an amniocentesis. That, in turn, must be done in time to allow for the culturing to take place, so that if it, too, proves positive for Down's Syndrome, the patient will have that information before the twenty-fourth week of pregnancy, in time to have an abortion if that is what she wishes to do. The normal "turn-around" time to obtain the results of an AFP test by mail, according to the evidence, is about four to five days, although the physician can request that the results be reported by telephone immediately.

---

8. That opinion was sharply contradicted by both petitioner's other expert, by respondent's experts, and by Dr. Magat, each of whom stated that it was not possible to culture the cells in a seven-day period.

It is with that background that we examine the evidence of what occurred at and after petitioner's first visit to Dr. Magat on April 19, some of which is in dispute. Dr. Magat said that, after concluding from the ultrasound procedure he performed that petitioner was 17 weeks and 5 days into her pregnancy, he gave her a number of referral slips for additional lab testing, including one for an AFP test and one for an "official" ultrasound, the latter to confirm the results of the office ultrasound. He said that he told petitioner to have the AFP test done the next day, and he dated that referral form April 20. Dr. Magat did not see petitioner again until May 18, 1995, her next scheduled appointment. By then, he had received the results of the "official" ultrasound test, performed on May 11, which reported a gestational date of 20.2 weeks. That was consistent with what his office ultrasound had shown. He was surprised to learn, however, that petitioner had waited until May 16 to have the AFP test performed, and he did not yet have the results of that test. He noted in petitioner's record that she was "noncompliant," which meant that she had not followed his instructions regarding the AFP test.

Dr. Magat said that he first saw the AFP report on May 25. It had been completed by the lab on May 19, a Friday, at 3:14 p.m. and had arrived at his office at some point during the next week. His partner, Dr. Epstein, saw the report first and pulled the chart for Dr. Magat. The report showed an extraordinarily low level of AFP and estimated the risk of Down's Syndrome as one in 57. The normal risk for Down's Syndrome was stated on the report as less than one in 270. Testimony by one of petitioner's experts put the normal risk for a person her age as one in 900; testimony by the other put the risk as one in 400. Dr. Magat said that, upon reading the report, he immediately called petitioner, told her that he was "suspicious for Down's Syndrome," but explained that, because, having waited four weeks to have the test performed, she was already 22 weeks and 4 days pregnant, that it took about two weeks to get the results back from an amniocentesis, that she would then be more than 24 weeks pregnant, and that it would then be too late to have an abortion in Maryland.

He said that he informed her that there were other States where she could go and that she responded that "she would not act on the results and she didn't want to do anything about it." Dr. Magat added that he informed petitioner that she could have an amniocentesis done anyway, although there were risks attached to that procedure, and she again said that she would not act. Finally, he said that he suggested that she get genetic counseling "to explore what options you have left," and that she replied, for a third time, that she "wouldn't do anything about it anyway."

Dr. Magat made a number of entries in this regard on petitioner's medical charts and records, some of which, at least facially, appear to be inconsistent. Following his conversation with petitioner, he noted on the lab report itself, "Pt informed Needs Genetic Conseling [*sic* ] Possible Amni." Part of petitioner's office medical record was kept on a three-page Sinai Hospital prenatal record form. Page two of that form contains, among other things, sections for laboratory results and treatment notes. In the laboratory section is a space for "AFP" and in that space is written "low too late for amni." In the treatment part is noted both "Genetic counseling possible amnio," and "too late for amnio." Page three of the form contains both dated entries, as in a log, and an undated "Problems List." Under the date of May 25, 1995, Dr. Magat initially wrote in the log part, "Pt is now 22-4/7 weeks. Pt. offered amnio even though she would be > 24 weeks by time results returned." He amended that entry, however, to read "Pt. too late for amnio because she would be > 24 weeks by time results returned," explaining that he had already made the initial note on the lab sheet and wanted this note to reflect the lateness of the test, the lateness of the results, and that, in Maryland, she would be too late to act on an amniocentesis. He noted as well, under the heading of "Problem List," "† AFP—too late for amnio." Nowhere on any of these records did Dr. Magat note his conversation with petitioner or that petitioner had decided not to have an amniocentesis and not to take any other action based on the AFP result.

Petitioner had a very different story, which changed as the case developed. As noted, in her complaint, she claimed that Dr. Magat refused even to recommend an AFP screening, alleging that he "would not administer a alpha feta-protein [*sic* ] screening . . . to her because Defendants advised Plaintiff that it was too late for her to undergo that screening procedure" and that Dr. Magat was "negligent in failing to administer a AFP screening." She repeated that charge in her answers to interrogatories-that Dr. Magat assured her that she had no risk factors and that it was too late for her to undergo "any testing," and that he "therefore, did not send her for AFP testing or any other genetic studies."

At trial, when faced with documentary evidence that she *did* have an AFP test, she said that Dr. Magat "probably spoke to me about the AFP testing, getting everything done." Her position at trial was that Dr. Magat never informed her of the results of the AFP test-that the call he testified to never occurred. She said that she had no idea that Ibrion was going to be a Down's Syndrome baby, that if she had been informed of the result of the AFP test she would have had an amniocentesis, and that if the amniocentesis revealed that she was carrying a Down's Syndrome child, she would have aborted the pregnancy.

The one neutral item of evidence bearing on this dispute— the referral slip filled out by Dr. Magat and given to petitioner to take to the lab when she got the AFP test—is, unfortunately, somewhat ambiguous with respect to dates. The copy of the slip entered into evidence, consisting of two pages, contains portions that are either difficult to read or have been blotted out altogether. The copy came from the lab that performed the test; Dr. Magat said that he does not keep copies of referral slips. The first page, captioned "Clinical Requisition," has a space at the top for "Date of Request." That space is blank. The main part of that page consists of a list of various kinds of tests. Presumably, the requesting physician is supposed to check the one(s) to be performed. Only one is checked, but, because of the condition of the exhibit, we cannot determine what it is. We infer it is the

AFP test. At the bottom of that page is the signature of Dr. Magat and a date of "5/16/95." The second page, captioned "Marker Assessment of Pregnancy (MAP) Request," also has a space at the top for Date of Request. That shows a date of "4/20/95." It contains mostly billing and insurance information, but near the bottom is a box for certain patient information that Dr. Magat filled out. At the very bottom of the form is a certification that Dr. Magat had discussed the AFP test with his patient and had obtained her informed consent for AFP testing, underneath of which is a place for the patient's signature, the date of that signature, and for Dr. Magat's signature and the date thereof. Both signatures appear. Petitioner's signature is dated May 16, 1995. There is no date after Dr. Magat's signature.

Dr. Magat testified that he filled out the form at the time of petitioner's first visit, on April 19, and dated it for April 20 on the assumption that she would have the test the next day. Similar forms for other kinds of tests were dated April 19. Magat said that he did not put the date of May 16 on the form. Petitioner claimed to have no recollection of when she received the form or when she had the test. She agreed that Dr. Magat had asked her to get the testing done the day after her first visit, which she confirmed was April 19, but she then questioned that and suggested, from the date on the bottom of the form, that it may have been May 16. There is nothing in the record to corroborate the suggestion that petitioner was not given the referral form on April 19. She did not see Dr. Magat again until May 18–after the test was performed.

The question of whether Dr. Magat informed petitioner of the result of the AFP test is a factual one, and any dispute over when she received the referral form is irrelevant to that issue. Clearly, the test was performed on May 16, and Dr. Magat first learned of the result on May 25. The focus of the expert testimony was on other issues—whether Dr. Magat should have followed up either with the lab or with petitioner when he did not receive the test result within a few days after April 20, and whether, in light of the prospect of petitioner being able to have an out-of-State abortion after 24 weeks, he

was negligent in assuming that it was too late for an amniocentesis, if that, indeed, was the case. To a large extent, that latter issue also hinges on factual disputes. Dr. Magat, as noted, testified that he *did* tell petitioner of the prospect of an out-of-State abortion and that she should seek genetic counseling, which would have revealed that prospect as well. Petitioner denied any such conversation.

Dr. Leonard LaBua, a gynecologist called as an expert by petitioner, opined that it was incumbent upon Dr. Magat to call petitioner when he did not receive the AFP test result within a few days after April 20—that he should have had "some method of fail-safe" when dealing with a time-sensitive diagnosis.[9] He opined further that, upon learning from petitioner on May 18 that the testing was done two days earlier, Dr. Magat should have called the lab and asked it to give him the results by telephone, so he would have them immediately. Waiting until May 25 to obtain and examine the report, according to Dr. LaBua, constituted a breach of the applicable standard of care. Dr. LaBua also faulted Dr. Magat's statement that it was too late for an amniocentesis, noting first that such a test can be performed at any time, and second that there was still time, in any event, for petitioner to have acted on the amniocentesis results and have an abortion, at least out of State. Petitioner's other expert, Dr. Borow, assuming, incorrectly, that the AFP test result was returned to Dr. Magat on May 19, opined that Dr. Magat "failed to adequately counsel the patient to interpret the laboratory test," to advise her of her viable options, and to "arrange for her to have appropriate genetic testing done to reveal the presence of the baby with a Down's syndrome [sic] and to afford her the opportunity to terminate the pregnancy in a timely fashion."

---

9. Dr. LaBua's testimony in this regard was that, given the fact that petitioner was 18 weeks into her pregnancy, "it was incumbent upon the physicians to get their lab work fairly quickly." He added, "If you order a test on the 19th and you don't have any results until the 25th, something is wrong. I mean, you should call the patient and see, did you know or did you get the slips or go find out why this report is not back. There's got to be a fail-safe thing, again, where you are talking about a time sensitive diagnosis."

Dr. Borow was the one who believed that amniocentesis results could be obtained within seven to ten days, using a "rush" technique, and it was on that basis that he believed there was time to have an abortion before the expiration of 24 weeks.

## DISCUSSION

### Petitioner's Contributory Negligence

In *Craig v. Greenbelt Consumer Servs., Inc.*, 244 Md. 95, 97, 222 A.2d 836, 837 (1966), we adopted the definition of contributory negligence stated in RESTATEMENT (SECOND) OF TORTS § 463:

> " 'Contributory negligence is conduct on the part of the plaintiff which falls below the standard to which he should conform for his own protection, and which is a legally contributing cause co-operating with the negligence of the defendant in bringing about the plaintiff's harm.' "

We concluded further in *Craig* that, in measuring contributory negligence, the standard of care imposed on a person for his or her own protection is that of a reasonable person under like circumstances, and that a reasonable person's conduct "is to be judged in the light of all the relevant knowledge which the person actually then had." *Id.* at 97, 222 A.2d at 837. The focus of the contributory negligence defense, we added in *Wegad v. Howard Street Jewelers*, 326 Md. 409, 417, 605 A.2d 123, 127 (1992), "is whether the plaintiff took appropriate precautions to protect his [or her] own interests." *See also County Commissioners v. Bell Atlantic-Maryland*, 346 Md. 160, 180, 695 A.2d 171, 181 (1997).

Both sides moved for judgment on the issue of contributory negligence at the end of the case. The motions were denied because the court concluded that, in light of the conflicts in the evidence bearing on the issue, the question was for the jury to decide. In moving for judgment in her favor and in pressing her claim on appeal, petitioner conceded that there was sufficient evidence produced for the jury to determine that Dr. Magat had instructed her on April 19, 1995, to

have the AFP test done immediately, that, in contravention of that instruction, she waited four weeks, until May 16, to have that test done, and that such a delay could constitute negligence on her part. Her point—her only point—was that, notwithstanding her delay, there was still time on May 19, when the test result was known, for her to undergo an amniocentesis and elect to abort the pregnancy, and that her contributory negligence therefore was not a proximate cause of her injury—the birth of her daughter. In her view, it was the negligence of Dr. Magat in not obtaining the test result promptly, in not advising her of that test result, and in failing to inform her of the option of having an abortion out of State that precluded her from making an informed decision to terminate the pregnancy. *That*, not her delay in getting the AFP test, proximately caused the injury.

On appeal, petitioner makes the additional argument that, in a case such as this, there can be but one proximate cause of the injury and that the evidence necessary to establish liability on Dr. Magat's part necessarily precludes a finding that any negligence on her part caused the injury. This argument, as presented, is somewhat imprecise but seems to focus on whether petitioner would have aborted the pregnancy had she been properly informed of the problem. For Dr. Magat's negligence to have been a proximate cause, she claims, the jury would have to have found that she *would* have terminated the pregnancy, and, thus, in finding him negligent, the jury must have so concluded. That finding, however, in her view, would preclude any delay on her part in having the AFP test from constituting a cause of the injury. She explains that, if the jury believed that Dr. Magat made the call on May 25 and correctly explained all of her options, as he testified, it could not have found any negligence on his part to be the proximate cause of her not aborting the pregnancy, for there would still have been time for her to do so. If, on the other hand, the jury concluded that he did *not* make that call or did not correctly explain her options, her delay in getting the AFP test would not have been the proximate cause of her not terminating the pregnancy.

There are a number of deficiencies in both arguments. The jury's findings of primary and contributory negligence were general in nature. They did not specify what conduct on the part of either Dr. Magat or petitioner the jury considered to be negligent, and there were several things from which to choose. Depending on how it viewed the evidence presented, the jury could have found that Dr. Magat was negligent in (1) not following up with petitioner when he failed to get an AFP test report within a few days after April 19, as Dr. LaBua testified, (2) not calling the lab to order an immediate telephonic report when he learned on May 18 that the test was not done until May 16, as Dr. LaBua further testified,[10] (3) not calling petitioner after he learned of the test result on May 25, as petitioner testified, or (4) in calling her but, in the belief that it was too late for anything to be done, in or out of State, failing to advise her of the out-of-State option, as some of his records suggest. As to petitioner, the jury could have found contributory negligence in her failure to get the AFP test done promptly or, if it found that Dr. Magat *did* call her on May 25 and explained to her the various options, including an out-of-State abortion or genetic counseling, that she acted unreasonably in not pursuing one of those approaches. Evidence showed that petitioner had some family history of Down's Syndrome, that she had an AFP test done in two of her earlier pregnancies, and that she had a history, in her earlier pregnancies, of missed appointments and delays. The jury could thus have inferred that petitioner understood both the risk of a Down's Syndrome baby and the need to be punctual and vigilant.

Petitioner's arguments rest on some questionable assumptions of what the jury must have found. They assume that the finding of primary negligence related, at least in part, to Dr.

---

10. We do not suggest that, from a legal point of view, a doctor has any general duty to follow up to see if a patient is carrying out his or her instructions. We note simply that there was expert testimony in this case that Dr. Magat should have followed up with both petitioner and the lab and that it was a breach of the applicable standard of care for him not to do so.

Magat's conduct from and after May 25, when he first became aware of the AFP test result, and further assume either that the jury credited Dr. Borow's challenged testimony that amniocentesis results could be obtained in seven days and that it was therefore still possible to obtain an abortion in Maryland, or that the jury credited petitioner's testimony that she would have traveled out of State, if necessary, to have an abortion.

Those assumptions may not be accurate, however. The jury could well have found that Dr. Magat properly explained all of the options available to petitioner on May 25, and that his negligence lay in not following up with either the lab or with petitioner when no report was received within a few days after April 20, as Dr. LaBua opined. The jury may have concluded that, had he done either, the AFP test result would have been obtained earlier, when there was still time to have amniocentesis confirmation prior to the twenty-fourth week of pregnancy, but that, by May 25, it was, in fact, too late to have the prognosis of Down's Syndrome confirmed by an amniocentesis in sufficient time to have an abortion in Maryland. If *that* was the basis of the jury's finding of primary negligence, as it reasonably might have been, the jury could well have found that petitioner's negligence in waiting so long to have the test done cooperated to make a Maryland abortion impossible. The jury obviously did not have to accept Dr. Borow's refuted testimony that amniocentesis results can be obtained in seven days.

That would leave, then, the question of an out-of-State abortion. Petitioner testified that she would have gone out of State, but the jury was not required to believe that she would, in fact, have traveled to a distant State, to an unknown doctor and with uncertain insurance coverage, to have an abortion or, indeed, that a decision on her part not to have an out-of-State abortion would have been unreasonable and would therefore suffice to preclude a finding of liability on Dr. Magat's part.[11] In that circumstance, the findings of primary

11. As we indicated, the standard of care imposed on a person in a contributory negligence analysis is that of a reasonable person under

and contributory negligence would not be inconsistent, as petitioner claims. It is not for petitioner, or for us, to speculate what specific facts the jury found or what conduct it found reasonable or unreasonable. There clearly was sufficient evidence to make the issue of petitioner's contributory negligence a jury issue, and the Circuit Court therefore did not err in denying her motion for judgment on that issue.

### *Last Clear Chance Instruction*

■ Petitioner requested the court to instruct the jury on the doctrine of last clear chance. The requested instruction is not in the record extract, as it should be if it is to be an issue in the appeal, but it is, at least, in the record. Petitioner asked the court to instruct the jury that "[i]f the defendants could have avoided the incident or occurrence, then it is the defendants' not the plaintiffs' failure to act which was the proximate cause of the injuries and damages suffered." The proposed instruction continued that the elements of the doc-

---

like circumstances, the question being whether the plaintiff took "appropriate precautions" to protect his or her own interest. *Wegad v. Howard Street Jewelers, supra,* 326 Md. at 417, 605 A.2d at 127. If a person has been placed in some danger of personal or economic injury through the negligence of another but is able, through reasonable effort, to avoid or ameliorate that danger, he or she must ordinarily do so. See *Lawson v. Price,* 45 Md. 123, 136 (1876); *Evans v. Murphy,* 87 Md. 498, 502–03, 40 A. 109, 110 (1898); *Groh v. South,* 119 Md. 297, 299–300, 86 A. 1036, 1037 (1913). The parties have looked at the issue of whether petitioner would have traveled out of State to have an abortion in a somewhat sterile manner-if she would have done so, as she claimed, one result follows; if she would not, as Dr. Magat said she told him, a different result follows. On the evidence in this case, that analysis is not inappropriate. We note, however, that when the negligent conduct of a defendant puts a plaintiff at the risk of injury, which the plaintiff has the ability to avoid or ameliorate only by taking some extraordinary measure or by incurring some other significant risk or expense, the plaintiff's refusal to take that measure or incur that risk or expense, if found to be reasonable, will not preclude liability on the part of the defendant. A defendant should not be able to put a plaintiff to that kind of Hobson's choice. Whether, in any given circumstance, the refusal of a patient to travel out of State (or out of the country) to obtain relief not available here is reasonable or unreasonable and thus would, or would not, break the chain of causation, will normally be a jury question, if evidence is presented on the issue.

trine were "1) the negligence of the defendants; 2) the contributory negligence of the plaintiff; and 3) something new or independent affording defendants a fresh opportunity to avert the consequences of defendants' original negligence and plaintiffs' contributory negligence."

The discussion regarding this proposed instruction occurred in chambers and was not recorded. The record reveals only that the request was apparently a conditional one, in the event the court gave an instruction on contributory negligence, which it did, and that petitioner objected to the court's refusal to give this instruction. We do not know the argument presented to the Circuit Court in support of the instruction. The argument on appeal is that "even if the jury could have found that [petitioner's] delay in obtaining the AFP test was a proximate cause of her inability to terminate her pregnancy, Defendant Magat still had the last clear chance to avert the incident by advising her of the abnormal result, to obtain amniocentesis, and allow her to terminate the pregnancy." The trial court denied the instruction on the ground that it was not "appropriate in this case." We agree.

The proposed instruction, both as worded and in the context of this case, was not appropriate because it was potentially misleading. The first sentence would have allowed the jury to use the primary negligence on the part of Dr. Magat that preceded or concurred in time with the contributory negligence on petitioner's part to overcome that contributory negligence and render a plaintiff's verdict despite it. The second sentence simply states the three elements of the doctrine but does not attempt to relate them to the issues before the jury.[12]

---

12. The standard "last clear chance" instruction suggested by the Maryland Civil Pattern Jury Instructions, MPJI § 19:12 (2d ed.1984), is that "[a] plaintiff who is contributorily negligent may nevertheless recover if he [or she] is in a situation of helpless peril and thereafter the defendant had a fresh opportunity of which he [or she] was aware to avoid injury to the plaintiff and failed to do so." We have pointed out that where the negligence of the plaintiff and defendant are concurrent in time or where the lack of a fresh opportunity is caused by the defendant's preexisting negligence, the defendant has no last clear chance, and the doctrine is not to be invoked. *See Dunn v. Eitel,* 231 Md. 186, 188–89,

As noted, the jury could have found primary or contributory negligence from several different acts or omissions, most of which, in combination, would have made a last clear chance analysis inapplicable. Indeed, the only circumstance in which a last clear chance analysis might arguably be applicable was if the jury were to have found that the primary negligence consisted of Dr. Magat's failure to be more diligent in following up with petitioner or the lab in obtaining the result of the AFP test, that that negligence concurred with petitioner's negligent delay in having the test done, and that Dr. Magat was then further negligent in failing to call petitioner, or failing to give proper advice to petitioner, after he obtained the test result.

That was not the thrust of petitioner's argument regarding Dr. Magat's primary negligence, however, which focused on her assertion that Dr. Magat never called her after he obtained the result, rather than any delay in obtaining the result. If the jury credited that version of primary negligence, there would have been no subsequent negligence, no fresh ability to avoid the peril. In between those two versions were a variety of others that would not lend themselves to a last clear chance analysis—whether the referral for the AFP test was on April 19, as Dr. Magat indicated, or closer to May 16, as petitioner suggested, whether she would have chosen to terminate the pregnancy, as she testified, or not, as Dr. Magat testified, whether, even if under the impression that it was too late for an abortion, Dr. Magat nonetheless recommended genetic counseling and petitioner declined to get it. There was a smorgasbord of possibilities and, as to most of them, the instruction requested by petitioner was inapplicable and could only have been confusing.

### Count I—Ibrion's Claim

The claim asserted in Count I, like that in Count II, falls within a cluster of tort actions that arise from the allegation

---

189 A.2d 356, 357 (1963); *Creighton v. Ruark,* 230 Md. 145, 151, 186 A.2d 208, 211 (1962); *Liscombe v. Potomac Edison Co.,* 303 Md. 619, 637–38, 495 A.2d 838, 847 (1985).

that the negligence of some third person has caused a child to be born, either at all or with some defect or impairment. These kinds of claims take many forms. The earlier and more traditional of them, brought either by the parents or on behalf of the child, were to recover damages for a prenatal injury actually caused to the child by the negligence of the defendant. The gravamen of the action is the injury so caused.

We have long recognized, under general negligence principles, a postnatal action, on the part of both the child and his or her parents, for the negligent infliction of prenatal, *in utero*, injuries to the child. *See Damasiewicz v. Gorsuch*, 197 Md. 417, 439–40, 79 A.2d 550, 560 (1951) (child suffering from injuries inflicted prior to birth as result of automobile accident caused by negligence of defendant may sue for damages); *State v. Sherman*, 234 Md. 179, 184, 198 A.2d 71, 73 (1964) (wrongful death action allowed for prenatal injuries to viable fetus that caused it to be stillborn). In *Group Health Ass'n v. Blumenthal*, 295 Md. 104, 119, 453 A.2d 1198, 1207 (1983), we extended that principle to allow a wrongful death action on behalf of a child who, by reason of his mother's physician's negligence, was born alive but so prematurely as to be unable to survive. We characterized the action as one for injuries sustained by the child prior to viability. *Id.* at 116, 118, 453 A.2d at 1206–07. The common theme in these cases is that, through negligent conduct, the defendant caused a specific harm to a child that, in turn, caused the child either to die or to suffer in some way, the only non-traditional feature being that the injury was inflicted while the child was still *in utero*.

The actions now before us are of a type that were not and, as a practical matter, could not have been, brought before the last half of the Twentieth Century. At their core, they rest to a large extent on the more recent advances in medical and scientific knowledge that made contraception more practical and reliable and made potential fetal injuries and defects detectable prior to birth, and even prior to conception, coupled with the loosening of the fetters on abortions triggered in 1973 by *Roe v. Wade, supra*, 410 U.S. 113, 93 S.Ct. 705, 35 L.Ed.2d

147. *See Smith v. Cote,* 128 N.H. 231, 513 A.2d 341, 345–46 (1986).

As noted in *Walker by Pizano v. Mart,* 164 Ariz. 37, 790 P.2d 735, 737 (1990), this newer variety of claims tends to fall into three general categories. The first, sometimes labeled "wrongful conception" or "wrongful pregnancy," are brought by "parents of a normal but unplanned child [seeking] damages either from a physician who allegedly was negligent in performing a sterilization procedure or abortion, or from a pharmacist or pharmaceutical manufacturer who allegedly was negligent in dispensing or manufacturing a contraceptive prescription or device." *Walker, supra,* 790 P.2d at 737. The second, sometimes denoted as "wrongful birth," consists of cases in which parents of a child born with birth defects allege that the negligence of prenatal health care providers or genetic counselors deprived them of the ability to abort the pregnancy because of the likelihood that the child would be born in an injured or impaired state. *Id.* Those actions are by the *parents* to recover the damages and expenses accruing to them from having to endure and raise such a child.

The third category, sometimes called "wrongful life," comprises actions brought by, or on behalf of, the child. At least two types of claims fall within this category—claims by "normal but unwanted children who seek damages either from [their] parents [or from others] negligently responsible for their conception or birth," and, as here, claims by impaired children asserting that, as a result of the defendant's negligence, their parents were precluded from making a decision to abort the pregnancy. *Id.* at 737–38. Although there is often some similarity or overlapping in the allegations of negligence that underlie these various kinds of claims, virtually every court has recognized some critical distinctions between the third category, of actions on behalf of the children, and the others.

In *Jones v. Malinowski,* 299 Md. 257, 473 A.2d 429 (1984), we recognized one branch of what some have referred to as a "wrongful birth" action, although in the Arizona construct, it

would fall into the "wrongful conception" category. We concluded that, where a negligently performed sterilization results in the birth of a healthy child, the parents of the child could sue the doctor for the expense of raising the unplanned child during her minority, reduced by the value of the benefits conferred on them by having the child. *Jones, supra*, 299 Md. at 270, 473 A.2d at 435. The issue there was not so much the substantive one of duty, breach, and causation as of how to calculate damages and whether, indeed, they were calculable. We concluded that a cause of action in tort for medical negligence in the performance of a sterilization procedure was well accepted, but that some courts had declined to require the negligent physician to bear the costs of raising the child, as that "would permit the parents to enjoy all the benefits of parenthood while shifting the entire financial burden to the tortfeasor—a burden out of proportion to the ·physician's culpability." *Id.* at 264, 473 A.2d at 432. That problem was addressed by the reduction mandated for benefits derived by the parents from the parent-child relationship. We were careful to note in *Jones* that the injury to the parents of a normal child was not the child itself and that "damages are not sought on the child's behalf in such cases." *Id.* at 270, 473 A.2d at 435–36.

*Reed, supra*, 332 Md. at 231, 630 A.2d at 1147, came close, in the initial pleading, to raising the issue now before us. The plaintiff parents sued the mother's prenatal health care providers for failing to inform them of the AFP test which, had it been properly performed, would have signaled the prospect of spina bifida and other neurological abnormalities. The complaint charged that, had that prospect been revealed, the parents would have requested amniocentesis and, upon confirmation of the problem, would have terminated the pregnancy. They sued in Federal court, alleging the breach of a duty to both them and the child, but they eventually abandoned the action that alleged a duty to the child. The principal issue before us, on certified questions transmitted by the U.S. District Court, dealt only with their own action—whether .

"Maryland recognizes a tort cause of action for wrongful birth when the doctor does not inform the patient about an available diagnostic test which might reveal the possibility of neural tube defects of the fetus, when these defects are genetically caused, when further diagnostic testing would be required to determine the nature and extent of any fetal defects, and when the plaintiff asserts that she would have aborted the child had she been made aware of the fetus's deformities."

*Id.* at 228, 630 A.2d at 1146. That action was similar to Count II in this case, and we held it viable.

This action, on behalf of the child, rests essentially on the same notion of duty, breach, and causation as claimed in *Reed*, but, on the important element of injury, it differs in a significant way. In *Reed*, the injury was the parents' emotional damages and the expenses to them of raising a disabled child—damages and expenses that they would not have suffered or had to bear had they been able, but for the negligence of the defendants, to terminate the pregnancy. Here, the alleged injury is to the child, for her own disability and the expenses she will have to bear, but, unlike *Damasiewicz, Sherman,* or *Jones,* the disability itself, from which the expenses will flow, was not caused by the defendant. The injury sued upon, that *was* allegedly caused by the defendant, is the fact that she was born; she bears the disability and will bear the expenses only because, but for the alleged negligence of Dr. Magat, her mother was unable to terminate the pregnancy and avert her birth. The issue is whether Maryland law is prepared to recognize that kind of injury—the injury of life itself.

It appears, at this point, that 28 States deny recovery for this kind of action—18 by case law, 10 by statute [13]—but that three, California, New Jersey, and Washington, provide for a

---

13. *See* IDAHO CODE § 5–334(2000); IND CODE ANN § 34–12–1–1 (Michie 2001); ME REV STAT. ANN tit. 24, § 2931 (West 2000) (refusing to recognize wrongful life cause of action when healthy child is born); MICH COMP LAWS ANN § 600–2971 (West 2001); MINN STAT ANN. § 145.424 (West 2000); MO REV STAT § 188.130 (2000); N.D. CENT.CODE § 32–03–

limited recovery. The issue has generated a great deal of commentary.[14] The States that, by case law, have refused to recognize this kind of action have given a variety of reasons—that the damage determination is too complex, the philosophical conundrum posed in determining whether a disabled existence is worse than non-existence, whether life, itself, can ever be regarded as an injury, and whether recognition of such an action would (1) be inconsistent with more fundamental principles that sanctify life, (2) denigrate the rights and dignity of disabled persons, and (3) because of the nearly theological nature of the underlying premise, create unacceptably disparate results if placed into the hands of judges and juries.

One of the earliest cases to address the issue and set out a framework for denying recognition of such a claim was *Gleitman v. Cosgrove*, 49 N.J. 22, 227 A.2d 689 (1967), a decision

43 (2001); 42 PA. CONS.STAT ANN. § 8305(B) (West 2001); S.D. CODIFIED LAWS § 21–55–1 (Michie 2001); UTAH CODE ANN. § 78–11–24 (2001).

14. *See* Strasser, Mark, Article, *Wrongful Life, Wrongful Birth, Wrongful Death, and the Right to Refuse Treatment: Can Reasonable Jurisdictions Recognize All But One?*, 64 Mo. L.REV. 29 (1999); Hanson, F. Allen, Article, *Suits for Wrongful Life, Counterfactuals, and the Nonexistence Problem*, 5 S. CAL. INTERDIS. L.J. 1 (1996); Kowitz, Julie F., Note, *Not Your Garden Variety Tort Reform: Statutes Barring Claims for Wrongful Life and Wrongful Birth Are Unconstitutional Under the Purpose Prong of* Planned Parenthood v. Casey, 61 BROOKLYN L.REV. 235 (1995); Laudor, Michael B., Article, *In Defense of Wrongful Life: Bringing Political Theory to the Defense of a Tort*, 62 FORDHAM L.REV. 1675 (1994); Belsky, Alan J., Article, *Injury as a Matter of Law: Is this the Answer to the Wrongful Life Dilemma?*, 22 U. BALT. L.REV. 185 (1993); Peters, Jr., Philip G., Article, *Rethinking Wrongful Life: Bridging the Boundary Between Tort and Family Law*, 67 TUL. L.REV. 397 (1992); Kelly, Michael B., Article, *The Rightful Position in "Wrongful Life" Actions*, 42 HASTINGS L.J. 505 (1991); Dawe, Timothy J., Note, *Wrongful Life: Time for a "Day in Court,"* 51 OHIO ST. L.J. 473 (1990); Berenson, Michael A., Comment, *The Wrongful Life Claim–The Legal Dilemma of Existence Versus Nonexistence: "To Be or Not to Be,"* 64 TUL. L.REV. 895 (1990); Gallagher, Kathleen, Comment, *Wrongful Life: Should the Action be Allowed*, 47 LA. L.REV. 1319 (1987); Kearl, Kurtis J., Note, Turpin v. Sortini: *Recognizing the Unsupportable Cause of Action for Wrongful Life*, 71 CALIF. L.REV 1278 (1983); Kennedy, Bernadette, Comment, *The Trend Toward Judicial Recognition of Wrongful Life: A Dissenting View*, 31 UCLA L.REV. 473 (1983).

later modified by the New Jersey court, as we shall discuss. The claim in *Gleitman* on behalf of the child, was that the mother, during the early part of her pregnancy, had contracted German measles, that she so informed her obstetrician but that he negligently assured her that there was no problem, that, as a result of that assurance, she did not abort the pregnancy, and that the child was born with substantial defects arising from his mother's exposure.[15] Although *Gleitman,* was decided before *Roe v. Wade, supra,* 410 U.S. 113, 93 S.Ct. 705, 35 L.Ed.2d 147, the court assumed that, in light of the possible birth defects that predictably could arise from the exposure, Mrs. Gleitman would have been able to have a lawful abortion. The court rejected the claim, however, on the ground that it was impossible to measure damages. Noting that damages in tort actions are compensatory in nature and are measured by "comparing the condition plaintiff would have been in, had the defendants not been negligent, with plaintiff's impaired condition as a result of the negligence," the court viewed the child's claim as measuring "the difference between his life with defects against the utter void of non-existence," and it concluded that "it is impossible to make such a determination." *Id.* at 692. The court explained:

"This Court cannot weigh the value of life with impairments against the nonexistence of life itself. By asserting that he should not have been born, the infant plaintiff makes it logically impossible for a court to measure his alleged damages because of the impossibility of making the comparison required by compensatory remedies."

*Id.* at 692.[16]

That core problem, with its several offshoots, has plagued all of the courts that have had to deal with the issue. In *Becker v. Schwartz,* 46 N.Y.2d 401, 413 N.Y.S.2d 895, 386

---

**15.** In *Gleitman,* as in most of the cases, claims were made on behalf of the parents as well. *Gleitman* declined to recognize any of the claims. Most courts have drawn a distinction and have recognized the parents' claim but not that of the child.

**16.** In a subsequent passage, the court, indeed, assumed that the child would have chosen life:

N.E.2d 807 (1978), the court, though accepting, *arguendo*, that the defendant physicians had a duty not only to the parent but also to the child *in utero*, nonetheless found two flaws with the child's action, the more fundamental of which was that the child did not suffer any legally cognizable injury.[17] It explained that, "[w]hether it is better never to have been born at all than to have been born with even gross deficiencies [was] a mystery more properly left to the philosophers and the theologians," and that "the law can assert no competence to resolve the issue, particularly in view of the very nearly uniform high value which the law and mankind has placed on human life, rather than its absence." *Id.* at 895, 386 N.E.2d at 812. Not only could the court find no common law or statutory basis for judicial recognition of the birth of a defective child as an injury to the child, the implications of such a proposition, it declared, "are staggering." *Id.*

The second flaw noted by the court concerned the remedy and mirrored the view of the *Gleitman* court. The remedy

---

"It is basic to the human condition to seek life and hold on to it however heavily burdened. If Jeffrey [the child] could have been asked as to whether his life should be snuffed out before his full term of gestation could run its course, our felt intuition of human nature tells us he would almost surely choose life with defects as against no life at all."
*Gleitman, supra,* at 693.

**17.** The *Becker* opinion dealt with two cases, raising the same issue, that had been consolidated. One of the cases, *Becker v. Schwartz*, was very similar to the one now before us. The parents sued the obstetrician for failing to inform them of an increased risk for a Down's Syndrome child, alleging that, had they been so informed, they would have opted for an amniocentesis and had that procedure confirmed the risk, they would have terminated the pregnancy. In the second case, *Park v. Chessin*, the parents had a child who was born with a kidney disease and survived for only a few hours. The obstetrician assured them that the disease was not hereditary and that there was little chance of another child being so afflicted. Upon that assurance, they conceived a second child, who was born with the same disease but who survived for over two years. Alleging that the disease was, in fact, hereditary, the parents contended that, had they been given the correct information, they would not have conceived the second child. In both cases, as here, actions were brought by both the parents, for their own damages, and on behalf of the child.

afforded to a party injured by someone's negligence "is designed to place that party in the position he would have occupied but for the negligence of the defendant," and "[t]hus, the damages recoverable on behalf of an infant for wrongful life [would be] limited to that which is necessary to restore the infant to the position he or she would have occupied were it not for the failure of the defendant to render advice to the infant's parents in a nonnegligent manner." *Id.* Given the allegation that, but for the defendant's negligence, the parents would have terminated the pregnancy, the action by the child "demands a calculation of damages dependent upon a comparison between the Hobson's· choice of life in an impaired state and nonexistence," a comparison "the law is not equipped to make." *Id.* "Recognition of so novel a cause of action," the court concluded, was best left for the legislature. *Id.; see also Elliott v. Brown,* 361 So.2d 546 (Ala.1978).

Most of the courts that have rejected this cause of action have done so on the ground that the child has not suffered a legally cognizable injury as the result of having been born, that, in turn, resting on either a doctrinal unwillingness to accept that life, even in an impaired state, is worse than nonexistence, *see Nelson v. Krusen,* 678 S.W.2d 918, 925 (Tex. 1984); *Lininger v. Eisenbaum,* 764 P.2d 1202, 1210 (Colo. 1988); *Garrison v. Medical Center of Delaware,* 581 A.2d 288, 294 (Del.1989); *Blake v. Cruz,* 108 Idaho 253, 698 P.2d 315, 322 (1984); *Siemieniec v. Lutheran Gen. Hosp.,* 117 Ill.2d 230, 111 Ill.Dec. 302, 512 N.E.2d 691, 702 (1987); *Bruggeman v. Schimke,* 239 Kan. 245, 718 P.2d 635, 642 (1986); *Azzolino v. Dingfelder,* 315 N.C. 103, 337 S.E.2d 528, 532–33 (1985); *Flanagan v. Williams,* 87 Ohio App.3d 768, 623 N.E.2d 185, 191 (1993); *Ellis v. Sherman,* 512 Pa. 14, 515 A.2d 1327, 1329 (1986), or on the metaphysical or the practical inability to measure the value of an impaired life as opposed to utter nonexistence. *See Moores v. Lucas,* 405 So.2d 1022, 1025 (Fla. App.1981); *Strohmaier v. Associates in Obstetrics & Gynecology, P.C.,* 122 Mich.App. 116, 332 N.W.2d 432, 434–35 (1982); *Dumer v. St. Michael's Hospital,* 69 Wis.2d 766, 233 N.W.2d 372, 375–76 (1975).

In *Berman v. Allan*, 80 N.J. 421, 404 A.2d 8 (1979), the New Jersey court revisited *Gleitman* and confirmed its rejection of a "wrongful life" action but on a more fundamental ground. It viewed *Gleitman* as resting primarily on the impossibility of ascertaining damages, which, in retrospect, the court found not to be a proper basis. Rather, the court held that the action was precluded because the child "has not suffered any damage cognizable at law by being brought into existence." *Berman*, 404 A.2d at 12. It explained that "[o]ne of the most deeply held beliefs of our society is that life—whether experienced with or without a major physical handicap—is more precious than non-life," that no one is perfect, that each person "suffers from some ailments or defects, whether major or minor, which make impossible participation in all the activities the world has to offer," and that "our lives are not thereby rendered less precious than those of others whose defects are less pervasive or less severe." *Id.* at 12, 13. The court noted that, despite her handicaps, the Down's Syndrome child then before it "will be able to love and be loved and to experience happiness and pleasure—emotions which are truly the essence of life and which are far more valuable than the suffering she may endure," and that "[t]o rule otherwise would require us to disavow the basic assumption upon which our society is based." *Id.* at 13. "This," the court said, "we cannot do." *Id.*

At least two courts have rejected a child's wrongful life action on the ground that, although a physician rendering medical care and advice to the mother has a duty to inform her of possible birth defects, that duty to inform does not extend to the fetus. *See James G. v. Caserta*, 175 W.Va. 406, 332 S.E.2d 872, 881 (1985); *Bogan v. Altman & McGuire, P.S.C.*, 2001 KY. APP. LEXIS 21, at *12–13 (Ky. Mar. 2, 2001).

The Arizona Supreme Court, in *Walker by Pizano v. Mart, supra*, 164 Ariz. 37, 790 P.2d 735, took a somewhat different approach to reach the same result. The court recognized that the defendant-physician had a duty to inform the parents about fetal problems and, as the *Becker* court did, assumed that the duty extended to the fetus as well. The alleged

injury was the inability of the parents to terminate the pregnancy which, in turn, resulted in the child being born. The court pointed out, however, that the child "had no control over whether to be conceived and no ability to prevent her birth, . . . neither the ability nor the right to determine questions of conception, termination of gestation, or carrying to term." *Id.* at 740. Thus, it held:

> "[T]he ability to decide questions of conception or termination of pregnancy resides in the parents, not the fetus. The law protects parents' rights to make decisions involving procreation. Because defendants negligently failed to provide the parents with information that would have prompted [the mother] to exercise her right to terminate the pregnancy, any wrong that was done was a wrong to the parents, not to the fetus."

*Id.*

In *Smith v. Cote, supra,* 128 N.H. 231, 513 A.2d 341, the New Hampshire court noted the reasons given by the New York and Texas courts for rejecting this kind of "wrongful life" action but offered, in addition, three other policy reasons for not recognizing it. Apart from whether courts were even *competent* to decide the value of life, it expressed the belief "that the courts of this State should not become involved in deciding whether a given person's life is or is not worthwhile." *Id.* at 352. "The right to life, and the principle that all are equal under the law, are basic to our constitutional order," the court added, and "[t]o presume to decide that [the child's] life is not worth living would be to forsake these ideals." *Id.* The second reason was related to the first and dwelt on the need not to disparage the dignity of the disabled. The court noted that disabled persons already face "devastating handicaps in the attitudes and behavior of society, the law, and their own families and friends," that "[r]ecent legislation . . . [reflected] a slow change in these attitudes," and that "[t]o characterize the life of a disabled person as an injury would denigrate both this new awareness and the handicapped themselves." *Id.* at 353 (quoting from Comment, *Wrongful Life: A Misconceived Tort,* 15 U.C. DAVIS L.REV., 447, 459–60 (1981)).

Finally, the court raised a practical objection. "Wrongful life actions," it said, were "premised on the ability of judges and juries accurately to apply the traditional tort concept of injury to situations involving complex medical and bioethical issues.... In the ordinary tort case the *existence* of injury is readily and objectively ascertainable. In wrongful life cases, however, the finding of injury necessarily hinges upon subjective and intensely personal notions as to the intangible value of life," and "[t]he danger of markedly disparate, and, hence, unpredictable outcomes is manifest." *Id.* at 853 (emphasis in original).

Three States have reached the conclusion that a child born with some impairment does have a limited cause of action where, because of the defendant's negligence, the child's parents were effectively deprived of the informed opportunity either not to conceive the plaintiff child or to abort the pregnancy and thus prevent the child's birth. Those States do not allow the child to recover "general" damages but permit a recovery for the extraordinary expenses of dealing with the impairment.

The first case so to hold was *Turpin v. Sortini,* 31 Cal.3d 220, 182 Cal.Rptr. 337, 643 P.2d 954 (1982). The complaint there arose from advice given to the parents in connection with the plaintiff-child's older sister. Although the sister, in fact, suffered from total deafness that was genetic in origin, the parents were told that the child was not deaf. Relying on that advice, they conceived the plaintiff, who also was born deaf. The child sued the doctor who had advised the parents, for both "general" damages for "being 'deprived of the fundamental right of a child to be born as a whole, functional human being without total deafness,' " and for special damages for the extraordinary expenses she would have to bear on account of her impairment. *Id.* at 337, 643 P.2d at 956.

The court acknowledged the uniform sentiment, at the time, rejecting such a claim, on the basis either of no cognizable injury to the child or of the impossibility of calculating damages. As to the first alternative, the court concluded that it

was unwilling, for purposes of determining whether the action should be recognized, to accept as a matter of law that an impaired life was not worse than no life at all. *Id.* at 337, 643 P.2d at 962–63. Noting that, by statute, competent adults in terminal condition were permitted to decide not to prolong their lives under certain circumstances, the court determined that, at least in some situations, public policy supported the right of persons to decide upon the relative value of life and death. *Id.* at 337, 643 P.2d at 962. The court acknowledged that an unborn child had no ability to make such a decision but concluded that, in making a decision whether to conceive in the first instance or terminate a pregnancy, the parents act in the interest of both themselves and the prospective child. The court held that, when a defendant negligently fails to diagnose a hereditary ailment, "he harms the potential child as well as the parents by depriving the parents of information which may be necessary to determine whether it is in the child's own interest to be born with defects or not to be born at all." *Id.*

Although rejecting the more metaphysical ground, the court found limited merit in the calculation of damages issue. It held that a claim for general damages, including pain and suffering, should be denied because "(1) it is simply impossible to determine in any rational or reasoned fashion whether the plaintiff has in fact suffered an injury in being born impaired rather than not being born, and (2) even if it were possible to overcome the first hurdle, it would be impossible to assess general damages in any fair, nonspeculative manner." *Id.* at 337, 643 P.2d at 963. The court explained that the harmed interest in a claim for general damages is the child's general well-being, but that, in measuring that harm, "it must be recognized that as an incident of defendant's negligence the plaintiff has in fact obtained a physical existence with the capacity both to receive and give love and pleasure as well as to experience pain and suffering." *Id.* at 337, 643 P.2d at 964. Accordingly, it held, "[b]ecause of the incalculable nature of both elements of this harm-benefit equation, we believe that a reasoned, nonarbitrary award of general damage is simply not attainable." *Id.*

The court had a different view as to special damages, however—recovery for the extraordinary expenses likely to be incurred in dealing with the impairment. Noting that the parents are allowed to recover those expenses, the court found it "illogical and anomalous" to preclude the child from recovering them. *Id.* at 337, 643 P.2d at 965. Those kinds of damages, it held, were readily measurable, and were therefore recoverable by the child.

In *Harbeson v. Parke–Davis, Inc.,* 98 Wash.2d 460, 656 P.2d 483 (1983), the Washington court had before it a complaint by two children, born impaired because their mother had continued to take dilantin during her pregnancies, against health care providers who had erroneously and negligently assured the mother that there was no danger in her continuing to take the dilantin to control diabetic seizures. Focusing first on the issue of duty, the court rejected the notion that recognizing a duty flowing to children not yet conceived would be inconsistent with the value of life and determined that recognition of such a duty would "foster the societal objectives of genetic counseling and prenatal testing, and will discourage malpractice." *Id.* at 496. The court agreed with the then-current New Jersey view expressed in *Berman v. Allan, supra,* that "measuring the value of an impaired life as compared to nonexistence is a task that is beyond mortals," but accepted the *Turpin* approach of disallowing general damages but permitting the action to recover the calculable costs of medical care and special training. *Id.* at 496–97.

Aside from a number of trial court decisions that have not yet been either blessed or cursed by the highest courts in their respective States, the final pronouncement, at the moment, seems to come from the court that first addressed the issue. In *Procanik by Procanik v. Cillo,* 97 N.J. 339, 478 A.2d 755 (1984), the New Jersey court departed from its holdings in *Gleitman* and *Berman* and adopted the approach of California and Washington, disallowing a claim for general damages but allowing one for special damages. The case was a particularly sympathetic one, as the parents' action to recover the extraordinary expenses had been barred by limitations, leaving the

prospect of no recovery. Noting that the financial impact of the child's impairment was felt not only by the parents but also the child, the court concluded that "[t]he right to recover the often crushing burden of extraordinary expenses visited by an act of medical malpractice should not depend on the 'wholly fortuitous circumstance of whether the parents are available to sue.' " *Id.* at 762 (quoting from *Turpin v. Sortini, supra,* 182 Cal.Rptr. 337, 643 P.2d at 965).

The court allowed that notion of fairness to extend only that far, however. It adhered to the view, with respect to general damages, that "there is no rational way to measure non-existence or to compare non-existence with the pain and suffering of [the child's] impaired existence," and that "[w]hatever theoretical appeal one might find from recognizing a claim for pain and suffering is outweighed by the essentially irrational and unpredictable nature of that claim." *Id.* at 763. In that regard, the court iterated the view that it was too speculative to allow the child to recover for emotional distress on the basis that he or she would have been better off if never born. "Such a claim," it said, "would stir the passions of jurors about the nature and value of life, the fear of non-existence, and about abortion," which, it continued, "is more than the judicial system can digest." *Id.*

These three cases are now 18 to 20 years old. No other appellate court has agreed with them. Some have noted but simply declined to follow them. Others have been outright critical of their reasoning. Two courts regarded them as "discard[ing] established principles of tort law sub silentio in an attempt to reach a 'right' result" and as premised on "an unexplained gap in the decisional reasoning." *Nelson v. Krusen, supra,* 678 S.W.2d at 930 (Robertson, J., concurring); *Siemieniec v. Lutheran Gen. Hosp., supra,* 111 Ill.Dec. 302, 512 N.E.2d at 701. The Colorado court had a similar view, "We can only conclude that the Washington Supreme Court, as did the Supreme Courts of California and New Jersey, chose to disregard the child's failure to prove an injury in light of its perception that the equities of permitting the child to recover special damages were entitled to greater weight."

*Lininger v. Eisenbaum, supra,* 764 P.2d at 1212. The Arizona court concluded that the limited recovery approach "exhibits a fundamental casuistry in their reasoning." *Walker by Pizano v. Mart, supra,* 790 P.2d at 740. The New Hampshire court concluded that the primary deficiency in the reasoning of those courts is that "it imposes liability even if the defendant has caused no harm" and that "[i]f the child cannot prove injury, 'it is unfair and unjust to charge the doctors with the infant's medical expenses.' " *Smith v. Cote, supra,* 513 A.2d at 354 (quoting in part from *Procanik,* 478 A.2d at 772 (Schreiber, J., dissenting in part)).

We have explored these cases, and the reasoning behind them, in some detail because the issue before us is one of great depth and fundamental importance. Every court, including the three that have recognized a limited right of recovery, has agreed that it is beyond at least the practical ability, if not the underlying competence, of the law to make a judgment regarding the value of life, even impaired life, as contrasted with non-life, and that is the issue; that is the basis of the alleged injury. Unless a judgment can be made, however, on the basis of reason rather than the emotion of any given case, that non-life is preferable to impaired life—that the child—plaintiff would, in fact, have been better off had he or she never been born-there can be no injury, and, if there can be no injury, whether damages can or cannot be calculated becomes irrelevant.

We align ourselves with the majority view and hold that, for purposes of tort law, an impaired life is *not* worse than non-life, and, for that reason, life is not, and cannot be, an injury. This case, indeed, illustrates why that is so. Ibrion has Down's Syndrome and the disabilities and impairments that proceed from that abnormality. There was no evidence that she is not deeply loved and cared for by her parents or that she does not return that love. Every recent study shows that people afflicted with Down's Syndrome can lead useful, productive, and meaningful lives—that they can be educated, that they are employable, that they can form friendships and

relationships and can get along in society. *See* NATIONAL DOWN SYNDROME SOCIETY, DOWN SYNDROME, *How Does Down Syndrome Affect a Person's Development?*, pp. 15–16 ("Children with Down's syndrome learn to sit, walk, talk, play, toilet train and do most other activities—only somewhat later than their peers without Down's Syndrome"; quality educational programs, a stimulating home environment, and good medical care enable people with Down's Syndrome to "lead fulfilling lives"); Trupin, Laura, MPH et al., *Trends in Labor Force Participation Among Persons With Disabilities, 1983–1994,* Disability Statistics Report (10), U.S. Dept. of Education, Natl. Inst. on Disability and Rehabilitation Research (showing that in 1994, 456,000 persons with mental retardation/Down' Syndrome (33.5% of those so afflicted) participated in the American labor force).

In our view, the crucial question, a value judgment about life itself, is too deeply immersed in each person's own individual philosophy or theology to be subject to a reasoned and consistent community response, in the form of a jury verdict. Allowing a recovery of extraordinary life expenses on some theory of fairness—that the doctor or his or her insurance company should pay not because the doctor caused the injury or impairment but because the child was born—ignores this fundamental issue and strikes us as simply a hard, sympathetic case making bad law. We shall affirm.

JUDGMENT OF COURT OF SPECIAL APPEALS AFFIRMED, WITH COSTS.