581 P.2d 271

The **SHELL OIL COMPANY, a Delaware Corporation, Richard B. Flint, d/b/a Flint Oil Company and Christie Oil Company, Inc., an Arizona Corporation, Appellants,**

v.

**Robert GUTIERREZ and Ramona Gutierrez, husband and wife, and Joseph E. Starr and Miriam Starr, husband and wife, Appellees.**

No. 2 CA–CIV 2571.

Court of Appeals of Arizona, Division 2.

May 9, 1978.

Rehearing Denied June 26, 1978.

430

Chandler, Tullar, Udall & Redhair by D. B. Udall, Tucson, for appellant Shell Oil Co.

Price, Tinney, Lindberg & Gianas by John E. Lindberg, Tucson, for appellant Flint Oil Co.

May, Dees & Barassi by Willis R. Dees, Tucson, for appellant Christie Oil Co.

Miller, Pitt & Feldman, P. C. by Robert F. Miller and Stanley G. Feldman, Tucson, for appellees.

## OPINION

HATHAWAY, Judge.

This appeal by the defendants in a products liability suit is from a judgment entered against them and in favor of plaintiffs-appellees Robert and Ramona Gutierrez and Joseph E. and Miriam Starr. The jury returned a verdict for plaintiffs and assessed damages at $500,000 for Gutierrez and $1,500,000 for Starr. On April 23, 1974, Robert Gutierrez and Joseph Starr, employees at Westinghouse Electric Corporation in Tucson, Arizona, were burned and severely injured at work when a metal drum which had contained liquid xylene exploded. Appellees brought an action in tort, based on strict liability, against Shell Oil Company, manufacturer and initial distributor of the xylene; Christie Oil Company, Inc. a Shell jobber, purchaser and packager of the xylene into drums; and Richard B. Flint dba Flint Oil Company, a Shell jobber, purchaser of xylene drums from Christie and retailer to Westinghouse. All defendants appeal. Shell and Flint have filed separate briefs, while Christie has adopted Flint's arguments. During the jury deliberations, appellees entered into Gallagher-type agreements, first with Christie and then with Flint.

The evidence, viewed in a light most favorable to sustaining the verdict, is as follows. Xylene, an organic solvent, is made, shipped and used in liquid form. While the liquid is flammable if ignited, the vapor has a high potential for explosion. Shell places on the tank cars or trucks in which xylene is shipped to Christie warning labels identifying the contents as xylene, as "flammable" and directing to keep it away from hear, sparks, or flames. After delivery, the xylene is transferred to storage tanks and then packaged by Christie into 55 gallon drums. Christie attaches, usually on the top of each drum, a "FLAMMABLE LIQUID" label. The label is diamond shaped and about 4″ by 4″. The letters and a picture of a shooting flame are in black against a red background.

· Westinghouse's operation in Tucson involved the rewinding of electrical motors. Xylene, purchased for use as a thinner to remove varnish from these motors, was stored before use in a segregated area at the plant. When the xylene is needed, the drums are tapped so the liquid may be withdrawn. Both bung holes are knocked out and a spigot is inserted in one. The other is left open so air pressure is maintained and the liquid will flow from the

barrel when the handle on the spigot is turned. The liquid is never entirely drained from a barrel. Although a point is reached where no further liquid can be obtained through the spigot, a small residue remains in the bottom of the barrel. The spigots are removed from such barrels and they are treated as "empties". The bung hole covers, removed for draining liquid, are then to be replaced, but Richard Stewart, plant manager at Westinghouse, testified that in fact they are frequently lost and not replaced. The empty drums were piled in a designated area for return when the next drums of xylene were delivered. A returnable deposit was charged on the drums.

The smaller the amount of liquid in the drum, the greater the hazard may be, there being more room for vapor. Thus "empty" drums may be considered more dangerous than full ones because of their potential for explosion. Expert testimony was given that the safest procedure for handling "empties" is to return them immediately instead of storing them. The second-best alternative is to clean them with an inactive solvent to remove the residue and to store them, with the bung holes covered away from heat and flames.

Gutierrez, a welder, was hired by Westinghouse about a week before the accident, and spent some of that time at a new plant across town. On April 23, he was asked to work on the construction of a new top for a dip tank. This work was being done in the yard of the old plant. There were several empty drums, of both the returnable and non-returnable type, in this area. Some supported a plank making a scaffolding, on which employees could stand and work on the tank. Returnable drums were generally not placed in this area, but were stored in a segregated area until they were returned. In some unexplained way, an empty xylene drum was moved from the segregated area to within a few feet of the dip tank.

Gutierrez had seen these empty drums and assumed they were being used for trash. He knew from prior work experience that empty drums such as these were used for trash barrels, platforms and scaf-

folding, and various other purposes. Stewart testified that it was not unusual at Westinghouse for empty drums to be so used. Hector Corrales, employed by the Tucson Fire Department in fire prevention and inspection testified that Westinghouse was about average among industrial users in its use of empty drums of "dangerous liquid" for many purposes.

Starr, a machinist, was given a broken bracket to bevel, then brought it to Gutierrez to weld. When Gutierrez began to weld, the drum which had contained xylene exploded, causing the injuries.

Examination of the drum after the accident revealed it had Shell colors, a red body and yellow on both ends. Shell was one of the two major sources from which Christie obtained drums for packaging the xylene. The word "xylene" was stencilled on the top of the drum and the "FLAMMABLE LIQUID" label supplied by Christie was also there.

A hotly debated issue at trial and on appeal was the extent of the parties' knowledge of the dangerous propensities of xylene. Christie had been marketing petroleum products for 27 years and Flint had been purchasing xylene for several years. Shell supplied multitudinous written information to them about the chemical properties of its products, including xylene, but xylene was not singled out or distinguished from other solvents. Christie and Flint were not advised on procedures for safe handling. They knew xylene was flammable and that an empty drum could explode. Yet, they did not know that drums should be returned immediately and Christie stored hundreds of them. Nor were they told to flush out the "empties". Consequently, no such warnings were passed on to Westinghouse. Shell advised Christie and Flint where to obtain labels, but not what their contents should be. Shell did not require as a condition to sale that any labels be placed on these drums, and did not follow up after sale to see what, if any, labels were actually used.

Gutierrez had not heard of xylene before the accident and had received no special

instruction or warning from Stewart concerning xylene drums. Starr's contact with xylene had been limited to dispensing it from a 5-gallon drum for washing his hands. He knew it was flammable and volatile. Appellees neither saw nor looked for labels on the drums by the dip tank. They both testified at trial that if they had seen the "FLAMMABLE LIQUID" label on the drum they would not have welded in that area.

## SHELL'S APPEAL

Appellees' two theories of recovery were both based on the strict liability concept of a "defective" and "unreasonably dangerous" product: (1) the product was defective because the label did not give adequate warning of the danger of explosion of vapor in a barrel drained of liquid and (2) the product was defective for failure to give adequate instructions for safe handling.

Shell argues that as a matter of law it is not liable to appellees because adequate warning to the vendee is all that can reasonably be required of the bulk manufacturer who has no control over the container in which the product is to be resold and cannot affix its own warning label. Shell contends that a manufacturer who sells its

product to a distributor who then repackages it fulfills its duty to the ultimate consumer when it ascertains that the distributor to whom it sells is adequately trained and is familiar with the properties of the product and safe methods of handling it and is capable of passing on his knowledge to his customers. Shell stresses the fact that Westinghouse was an "industrial user" with knowledge of the dangers.

Under both negligence and strict liability standards manufacturers and other suppliers have a duty to users, consumers, and in some circumstances, to the general public or portions of it, to produce products with appropriate warning instructions and other safety features. 2 Restatement (Second) of Torts, Secs. 388 and 402A; *Hall v. E. I. Du Pont De Nemours & Co., Inc.,* 345 F.Supp. 353 (E.D. N.Y. 1972). A duty to warn may be imposed on a manufacturer under strict liability principles if without a warning his product would be ". . . in a defective condition unreasonably dangerous to the user or consumer . . ." 2 Restatement (Second) of Torts, Sec. 402A.[1]

Appellees maintain that the question of duty to warn in the case of a remote supplier under Sec. 402A is to be determined under Sec. 388[2] of the Restatement which

1. "Sec. 402A. Special Liability of Seller of Product for Physical Harm to User or Consumer

(1) One who sells any product in a defective condition unreasonably dangerous to the user or consumer or to his property is subject to liability for physical harm thereby caused to the ultimate user or consumer, or to his property, if

(a) the seller is engaged in the business of selling such a product, and

(b) it is expected to and does reach the user or consumer without substantial change in the condition in which it is sold.

(2) The rule stated in Subsection (1) applies although

(a) the seller has exercised all possible care in the preparation and sale of his product, and

(b) the user or consumer has not bought the product from or entered into any contractual relation with the seller."

Comments to Sec. 402A provide in pertinent part:

"*h.* A product is not in a defective condition when it is safe for normal handling and con-

sumption. If the injury results from abnormal handling . . . the seller is not liable. Where, however, he has reason to anticipate that danger may result from a particular use . . . he may be required to give adequate warning of the danger (see Comment *j*), and a product sold without such warning is in a defective condition. . . ."

"*j. Directions or warning.* In order to prevent the product from being unreasonably dangerous, the seller may be required to give directions or warning, on the container, as to its use. . . . Where warning is given, the seller may reasonably assume that it will be read and heeded; and a product bearing such a warning, which is safe for use if it is followed, is not in defective condition, nor is it unreasonably dangerous."

2. "Sec. 388. Chattel Known to be Dangerous for Intended Use

One who supplies directly or through a third person a chattel for another to use is subject to liability to those whom the supplier should expect to use the chattel with the consent of the other or to be endangered by its probable

discusses the duty to warn in actions which sound in negligence. They define duty as a relationship under which one party has an obligation to conform to a standard of conduct in order to avoid injuring another. Prosser, The Law of Torts, Sec. 53 (4th ed. 1971). There is no reason, they argue, why the question of duty in avoiding distribution of defective and unreasonably dangerous products should vary simply because the standard of conduct imposed is strict liability rather than negligence.

Interplay continues between the two doctrines. In determining the scope of a remote supplier's duty to warn in a strict liability action under Sec. 402A, a number of courts have discussed the negligence concept of liability as expressed by Sec. 388. *Borel v. Fibreboard Paper Products Corporation et al.,* 493 F.2d 1076 (5th Cir. 1973); *Hall v. E. I. Du Pont De Nemours & Co., Inc.,* supra; *Brizendine v. Visador Company,* 437 F.2d 822 (9th Cir. 1970); *Anderson v. Klix Chemical Co., Inc.,* 256 Or. 199, 472 P.2d 806 (1970); *Jacobson v. Colorado Fuel and Iron Corporation,* 409 F.2d 1263 (9th Cir. 1969). See Annot., 53 A.L.R.3d 239. We find such a discussion helpful in describing the circumstances in which such duty comes into play.

■ Shell's argument that warning to the distributor is all that can be required is contrary to the Restatement. As stated in 2 Restatement (Second) of Torts, Sec. 388, Comment n:

"Giving to the third person through whom the chattel is supplied all the information necessary to its safe use is not in all cases sufficient to relieve the supplier from liability. It is merely a means by which this information is to be conveyed to those who are to use the chattel. The question remains whether this method

use, for physical harm caused by the use of the chattel in the manner for which and by a person for whose use it is supplied, if the supplier

(a) knows or has reason to know that the chattel is or is likely to be dangerous for the use for which it is supplied, and

(b) has no reason to believe that those for whose use the chattel is supplied will realize its dangerous condition, and

gives a reasonable assurance that the information will reach those whose safety depends upon their having it. All sorts of chattels may be supplied for the use of others, through all sorts of third persons and under an infinite variety of circumstances. This being true, *it is obviously impossible to state in advance any set of rules which will automatically determine in all cases whether one supplying a chattel for the use of others through a third person has satisfied his duty to those who are to use the chattel by informing the third person of the dangerous character of the chattel, or of the precautions which must be exercised in using it in order to make its use safe. . . .*" (Emphasis ours)

■ Appellees do not claim that Shell had an absolute obligation to convey information directly or personally to them. There are no absolutes in determining either existence of the duty or its satisfaction. Assuming a duty exists, whether a warning beyond the manufacturer's immediate vendee is required in a particular case depends upon various factors. Sec. 388, Comment n. Among them are the likelihood or unlikelihood that harm will occur if the vendee does not pass on the warning to the ultimate user, the trivial or substantial nature of the probable harm, the probability or improbability that the particular vendee will pass on the warning and the ease or burden of the giving of warning by the manufacturer to the ultimate user. "Where the danger involved in the ignorant use of their true quality is great and such means of disclosure are practicable and not unduly burdensome, it may well be that the supplier should be required to adopt them." Sec. 388, Comment n; *West v. Broderick &*

(c) fails to exercise reasonable care to inform them of its dangerous condition or of the facts which make it likely to be dangerous."

While Sec. 388 is directed to suppliers of chattels in general, Sec. 394 expressly places the same duty upon manufacturers of chattels.

*Bascom Rope Company,* 197 N.W.2d 202 (Iowa 1972).

■ Shell being a bulk supplier in carload lots and not having direct access to the barrels does not insulate it from liability. Labeling the container is but one of the methods which may give adequate warning. See *Davis v. Wyeth Laboratories, Inc.,* 399 F.2d 121 (9th Cir. 1968). Lack of access to the final form in which the product reaches the user is simply one of the considerations bearing upon the existence and extent of duty.

■ Whether a product is "defective" or "unreasonably dangerous" because of a failure to warn ". . . depends on the same considerations respecting harm already discussed in the context of negligence: foreseeability, seriousness and cost of preventing." *Hall v. E. I. Du Pont De Nemours Co., Inc.,* supra, at 368. As in the case of negligence, the greater the product's dangers when defects are present, the less the power of the court to preclude recovery by foreclosing a jury judgment of culpability. *Hall v. E. I. Du Pont De Nemours & Co., Inc.,* supra; *Davis v. Wyeth Laboratories, Inc.,* supra.

■ The determination as to whether the supplier's duty measured by these considerations has been reasonably discharge comes within the function of the trier of fact. *Dougherty v. Hooker Chemical Corporation,* 540 F.2d 174 (3rd Cir. 1976); *First National Bank in Albuquerque v. Nor-Am Agricultural Products, Inc.,* 88 N.M. 74, 537 P.2d 682 (1975). There is adequate evidence in this record to support a finding that Shell failed to adequately warn Christie or Flint of the danger of explosion, the possible precautions, or the type of labeling that would be appropriate.

■ Shell next contends that if this court does not agree that it is entitled to have judgment entered in its favor as a matter of law, then the verdict should be set aside and a new trial ordered because certain evidentiary rulings made by the court before trial were erroneous and prevented it from obtaining a fair trial. The

court rules that expert testimony would be admissible as to the various propensities of xylene, but that the ultimate opinion of an expert as to whether the "FLAMMABLE LIQUID" label was adequate would be excluded from evidence. The determination of the admissibility of expert testimony is within the sound discretion of the trial court. *W. R. Skousen Contractor, Inc. v. Gray,* 26 Ariz.App. 100, 546 P.2d 369 (1976). Expert testimony is admissible where it will aid the trier of fact in determining a fact in issue. It is proper, however, not to permit an expert to express an opinion in a matter where the jury is as competent to determine the fact in issue as the expert. Expert opinions will be rejected where the facts can be intelligently described to and understood by the jurors so that they can form reasonable opinions for themselves. *Hinson v. Phoenix Pie Company,* 3 Ariz. App. 523, 416 P.2d 202 (1966). As stated in *Walton v. Sherwin-Williams Co.,* 191 F.2d 277 at 285–86 (8th Cir. 1951):

". . . the adequacy of a set of warnings or directions is not a scientific matter. Whether or not a given warning is adequate depends upon the language used and the impression that it is calculated to make upon the mind of an average user of the product."

■ The trial court did not abuse its discretion in excluding such testimony. The jury was as competent as any expert to determine whether the "FLAMMABLE LIQUID" label was adequate to convey the hazard of explosion of an empty barrel and to instruct on safe methods of handling the barrel.

■ Pursuant to a motion in limine filed by appellees, the court also ruled that there would be excluded from evidence ". . . any matters which tend to show that the Defendant's label complied with all government and industrial regulations . . ." The exclusion applied both to direct and to cross-examination. Appellees concede that in a negligence case where the issue is whether the defendant's conduct conformed to the standard of reasonable care, proof of compliance with government regulations

and industry standards may be evidence of whether the defendant's conduct was reasonable. They argue, however, that in a strict liability case the issue is the result of defendant's conduct, whether the warning and instructions were adequate, and not the quality of that conduct. *Dougherty v. Hooker Chemical Corporation,* supra; *Jackson v. Coast Paint and Lacquer Company,* 499 F.2d 809 (9th Cir. 1974). Shell has not demonstrated that such standards and regulations exist so we need not decide whether evidence of compliance with them is relevant and admissible. The only government regulations relating to the labeling of xylene which Shell or the other defendants sought to introduce are contained in Title 49 of the Code of Federal Regulations. These regulations, promulgated by the Department of Transportation, indicate that xylene must be marked with a "FLAMMABLE LIQUID" label, but only while in transport. 49 C.F.R. Secs. 171.1 and 172 (1976). They do not apply and were not intended to give warning of the dangers of xylene when the product has reached its destination. An examination of the documents submitted to the court in conjunction with Shell's offer of proof reveal that certain organizations had published advice about the type of factors to be considered in labeling. These exhibits do not establish any industry standard for a particular label on 55 gallon drums of xylene, and the court committed no error in excluding the evidence.

Shell was also properly precluded from cross-examining appellees' witnesses as to its compliance with standards for labeling xylene. An expert witness may be cross-examined only upon matters affecting the expert's credibility or upon technical matters in his field of expertise. Udall, Arizona Law of Evidence, Sec. 25. None of appellees' witnesses purported to be experts on standards for labeling nor did they attempt to express an opinion on whether this label was adequate or whether it conveyed warning of the dangers which they described in their testimony.

## FLINT'S APPEAL

On appeal, Flint raises several issues, none of which merit reversal. He first contends that the trial court should have directed a verdict in his favor because the "FLAMMABLE LIQUID" label was adequate as a matter of law. Whether a warning is adequate to apprise foreseeable users of the dangers inherent in the product is ordinarily a question of fact and was properly left to the jury. *First National Bank in Albuquerque v. Nor-Am Agricultural Products, Inc.,* supra.

Flint next argues that Westinghouse was fully aware of the dangers of empty drums which had contained xylene and that Flint had the right to consider the community of the consumer in determining the nature of the warning to be given. He claims that as a matter of law he had a right to rely on Westinghouse properly instructing and warning its employees as to the danger. Westinghouse was not, however, engaged in a sophisticated technical specialty where the supervising personnel and the workmen themselves were highly trained "experienced professionals" with a high degree of expertise involving xylene. See *Martinez v. Dixie Carriers, Inc.,* 529 F.2d 457 (5th Cir. 1976); *Jacobson v. Colorado Fuel and Iron Corporation,* supra.

Flint's third point is that any inadequacy in labeling was not a cause in fact of the injuries, since appellees did not read the warning which was given. That the party who is injured might not have read or heeded a warning is not always sufficient to disprove the existence of a causal relationship between the injury and the defect. Adequate warning could have actuated a policy in handling "empties" which would have prevented the accident. *DeSantis v. Parker Feeders, Inc.,* 547 F.2d 357 (7th Cir. 1976). Had the label stated that the barrel should be washed with an inert solvent, stored with the bung holes covered, and returned immediately, presumably the barrel would not have been where it was.

Furthermore, the adequacy of a warning label is not determined solely by

reference to the words on the label but also by reference to the physical aspects of the warning, such as conspicuousness, prominence, and relative size of print. All of these physical aspects must be adequate to alert the reasonably prudent person. *First National Bank in Albuquerque v. Nor-Am Agricultural Products, Inc.,* supra. Here, the only label attached to the barrel was small in size, approximately 4″ × 4″. The jury could have determined that the physical aspects of this label were inadequate in light of the foreseeable risk of injury, and that if a larger and more conspicuous label was attached, it would have been seen, read and heeded.

There was substantial evidence from which the jury could have concluded that the failure of the defendants to provide an adequate warning was a factor in producing the injuries. Cause in fact was an issue for the jury. Prosser, The Law of Torts, Sec. 41 (4th ed. 1971).

▆▆▆▆ The fourth argument concerns jury instructions refused by the court. Flint maintains that Westinghouse's violation of government safety regulations was the sole cause as a matter of law, or was at least a supervening cause, of the injuries sustained, and that the court erred in failing to instruct the jury as requested. His proposed instruction, a long discourse on these alleged violations, sought to transform a products liability case against Shell and its distributors into a negligence trial of Westinghouse. This instruction was both confusing and irrelevant. The issue on proximate cause was not whether Westinghouse was negligent but whether its acts were a superseding cause. *Serrano v. Kenneth A. Ethridge Contracting Company,* 2 Ariz.App. 473, 409 P.2d 757 (1966). A superseding cause is one which is both unforeseeable and highly extraordinary. *Serrano v. Kenneth A. Ethridge Contracting Company,* supra. If empty barrels are commonly used for a variety of purposes in industrial environments, and the testimony on this issue was uncontroverted, then the exposure of such barrels to areas of heat and sources of ignition was foreseeable, and as a

matter of law the acts and omissions of Westinghouse could not have been a superseding cause. Such acts and omissions by Westinghouse employees were in fact the very thing which necessitated a warning of danger and instructions regarding safe handling of empty barrels. *Suchomajcz v. Hummel Chemical Company,* 524 F.2d 19 (3rd Cir. 1975); *First National Bank in Albuquerque v. Nor-Am Agricultural Products, Inc.,* supra.

▆▆▆▆ Nor did the trial court err in refusing to instruct the jury on the doctrine of assumption of the risk. Although this is a potential defense to an action for strict liability in tort, the facts in this case do not support such an instruction. An examination of Flint's argument reveals that his contention really is that appellees were contributorily negligent in failing to discover the existence of the danger, and not that either of them actually assumed any risk of a known danger. Failure to discover the danger is not a defense in an action based upon strict liability. 2 Restatement (Second) of Torts, Sec. 402A, Comment n.

▆▆▆▆ Flint's fifth argument involves alleged juror misconduct. Appellants complained to the court that during a recess in voir dire examination, a member of the jury panel, within the hearing of two other persons on the panel, asked, "Why don't we just give them Ten Million Dollars and go home?" Appellants could name only one of the three members involved. They asked the court to question that person, learn the names of the others, and interrogate them. The judge refused stating that he did not think the remark indicated prejudice toward appellants and he could not believe the remark had been made in earnest at this early stage. Appellants moved for a mistrial. The court did not abuse its discretion in refusing to interrogate the jurors on this point. *State v. Molina,* 5 Ariz.App. 492, 428 P.2d 437 (1967). No probability of prejudice to appellants appearing on the record, it will not be assumed. *Ulan v. Richtars,* 8 Ariz.App. 351, 446 P.2d 255 (1968).

Flint's sixth point is that the court erred in allowing a witness on rebuttal to read a statement signed by Flint in which he declared that he did not add any other labels to the xylene drums upon receiving them from Christie. At trial he testified, contrary to his deposition testimony, that he did add another label which gave safety precautions. On appeal he claims the admission of this evidence was "not proper impeachment" and "not a new fact to be rebutted." These objections were not raised below. No objection having been made to admission of the statement, except that the written statement, by then marked in evidence, need not be read aloud and "would speak for itself", appellate consideration was waived. *Stroud v. Dorr-Oliver, Inc.,* 112 Ariz. 403, 542 P.2d 1102 (1975).

Flint next contends that the trial court should have excluded the testimony of Tom Kay, manager of Circle X Signs, because his testimony went beyond that revealed in answers to interrogatories. Appellees' supplemental answers to interrogatories disclosed that the manager of Circle X Signs "will testify as to . . . the adhesive qualities of the material used to adhere them [warning labels] to a 55 gallon drum, and the permanence of said warning labels." His opinion at trial, based upon the lack of any residue of adhesive on the barrel after the explosion, was that there had never been a second warning label attached to the barrel. Flint's objections to Kay's testimony were lack of proper foundation and improper rebuttal. Evidence will not be excluded from rebuttal just because it might have been made part of the case in chief. *Jansen v. Lichwa,* 13 Ariz. App. 168, 474 P.2d 1020 (1970). We do not agree with Flint that Kay's testimony went beyond that revealed in answers to interrogatories. In any event, this objection is raised for the first time on appeal and must be deemed waived.

Flint's final argument is that the court's refusal to allow evidence of compliance by appellants with government and industrial labeling standards either on direct or cross-examination was error. We reject this argument on the basis of our consideration of the same question raised by Shell and already discussed.

Affirmed.

HOWARD, J., and LLOYD FERNANDEZ, Superior Court Judge, concur.

NOTE: Chief Judge JAMES L. RICHMOND having requested that he be relieved from consideration of this matter, Judge LLOYD FERNANDEZ was called to sit in his stead and participate in the determination of this decision.